William F. LORENZ and Karen M. Lorenz, his wife; Victor A. Czerny; John Schmidt, and Janice J. Schmidt, his wife; Marjorie Slapin; Thaddeus E. Drake and Celia Drake, his wife; and Edith E. Berenkey: individually and on behalf of a class of former debentureholders similarly situated, Plaintiffs,

v.

CSX CORPORATION (formerly Chessie Systems, Inc.), The Chesapeake & Ohio Railroad Company and The Chase Manhattan Bank, N.A., Defendants.

Ethel B. SAVIN, Individually and on behalf of a Class of former debentureholders similarly situated, Plaintiffs,

v.

CSX CORPORATION (formerly Chessie System, Inc.), The Chesapeake & Ohio Railroad, The Baltimore & Ohio Railroad Company and The Chase Manhattan Bank, N.A., Defendants.

Civ. A. Nos. 87–866, 87–971.

United States District Court,
W.D. Pennsylvania.

April 27, 1990.

Michael P. Malakoff, Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pa., for plaintiffs.

Edwin J. Mills, Stull, Stull & Brody, New York City, for Ethel B. Savin.

Anthony J. Basinski, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Chesapeake & Ohio R. Co. and Baltimore & Ohio R. Co.

Robert C. Myers and Michele Gapinski, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, and H. Woodruff Turner, Kirkpatrick & Lockhart, Pittsburgh, Pa., for Chase Manhattan Bank.

## OPINION

COHILL, Chief Judge.

This is the latest chapter in a long, tortuous history of litigation between the defendant railroads and holders of convertible debentures. This multi-faceted case traces its origins back 13 years and in that time it has spawned 8 separate but related lawsuits in this district[1] and several more loosely related cases in other states.[2] The litigation in this district alone has generated 8 published opinions, 6 appeals, and 2 petitions for certiorari to the United States Supreme Court which were mercifully de-

nied. The litigation has outlived two fine, dedicated district court judges, the Honorable William Knox and the Honorable Gerald J. Weber, who struggled manfully with the case and succeeded in resolving the core of the dispute, leaving the undersigned with the motions we address today.

## I. FACTS AND PROCEDURAL HISTORY

As hinted above, the litigation history here is quite extensive, and a detailed understanding may be gleaned from prior Opinions.[3] Nonetheless, the two cases before us today must be viewed in the larger context of the prior litigation, and we therefore embark on a review of the ground covered by others before us.

In 1956 the Baltimore and Ohio Railroad Company (B & O) created a class of convertible debentures maturing in the year 2010. The debentures are convertible to B & O common stock at any time prior to maturity. By the terms of the Indenture, defendant Chase Manhattan Bank, N.A. (Chase) serves as indenture trustee.

Although B & O common stock was once listed and traded on the New York Stock Exchange, by 1964 the Chesapeake & Ohio Railroad Co. (C & O) had acquired 99% of the outstanding common stock. Trading ceased, and B & O stock was delisted.

---

1. *Pittsburgh Terminal Corp. v. B & O Railroad Co.,* CA 77–1455; *Guttmann v. B & O Railroad Co.,* CA 79–94; *Lowry v. B & O Railroad Co.,* CA 79–1504; *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* CA 84–865; *Ciarlante v. CSX Corp.,* CA 84–1135; *Harlib v. B & O Railroad Co.,* CA 84–1819; *Lorenz v. CSX Corp.,* CA 87–866; *Savin v. CSX Corp.,* CA 87–971.

2. *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.,* 110 F.R.D. 4 (S.D.W.Va.1985).
 *Pittsburgh Terminal Corp. v. B & O Railroad Co.,* 662 F.Supp. 430 (N.D.Ohio 1987); *aff'd* 875 F.2d 549 (6th Cir.1989).
 *Walk v. B & O Railroad Co.,* 659 F.Supp. 824 (D.C.Md.1987); *aff'd* 847 F.2d 1100 (4th Cir. 1988); *rev'd,* 890 F.2d 688 (4th Cir.1989).
 *Lockspeiser v. Western Maryland Co.,* 768 F.2d 558 (4th Cir.1985).
 Also note that one of the present cases, *Savin v. CSX Corp.,* CA 87–971, was originally filed in the U.S. District Court for the Southern District of New York, and was transferred here pursuant to 28 U.S.C. § 1404.

3. *Pittsburgh Terminal Corp. v. B & O,* 446 F.Supp. 656 (W.D.Pa.1978) (Knox, D.J.) (preliminary injunction granted); *rev'd* w/o published opinion, 578 F.2d 1375 (3d Cir.1978); on remand, 509 F.Supp. 1002 (W.D.Pa.1981) (Knox, D.J.); *aff'd in part, rev'd in part,* 680 F.2d 933 (3d Cir.1982); *cert. den. sub nom. Price v. Pittsburgh Terminal Corp.,* 459 U.S. 1056, 103 S.Ct. 475, 74 L.Ed.2d 621 (1982); on remand, 586 F.Supp. 1297 (W.D.Pa.1984), (Weber, C.J.); *aff'd* w/o published opinion *sub nom. Guttman v. B & O RR Co.,* 760 F.2d 257 and 760 F.2d 260 (3d Cir.1985); *cert. den.* 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed.2d 256 (1985); *Appeal of Harlib,* 824 F.2d 249 (3d Cir.1987); unpublished memorandum, Aug. 15, 1989 (W.D.Pa.) (Petition of Juttings, presently on appeal).
 *Lowry v. B & O RR Co.,* 707 F.2d 721 (3d Cir.1983) (*affirming*); *reh. den.* 711 F.2d 1207 (3d Cir.1983); on remand, 629 F.Supp. 532 (W.D.Pa.1986).
 *Ciarlante v. CSX Corp.,* 629 F.Supp. 534 (W.D. Pa.1986).

By December 1977, the C & O owned 99.63% of B & O common stock, the remainder being in a few private hands. The C & O in turn was wholly owned by the Chessie Systems, Inc., now known as CSX Corporation (CSX), a defendant here.

In the mid–1970's, this railroad empire began studying a reorganization. Interstate Commerce Commission regulations hampered the development of non-rail assets owned by railroads, such as timberland and mining rights. To properly realize the development potential of these non-rail assets while avoiding the strictures of the ICC, company officials devised a plan to segregate B & O's rail and non-rail assets. Under the plan, non-rail assets were transferred to a subsidiary, the Mid Allegheny Corporation (MAC). MAC common stock was then distributed to B & O shareholders as a dividend on a share for share basis.

As part of the reorganization strategy, company officials sought to avoid registration of MAC stock with the Securities Exchange Commission (SEC). Registration would have required expensive appraisals of all non-rail assets, a process which would have taken years. Because B & O had so few shareholders, the Company believed it would receive a "no-action" letter from the SEC, excusing the registration of MAC stock. However, if sufficient numbers of debenture holders converted to B & O common stock to participate in the dividend, registration of MAC stock, with all its attendant expense and delay, would be required.

To avoid this possibility, management devised the ill-fated plan which provided the seed for this litigation. Under the plan, all B & O non-rail assets were transferred to MAC on December 13, 1977. On that same date, B & O declared the dividend in MAC stock, payable to all B & O shareholders of record *on that date.* No prior notice of the reorganization or the dividend was provided and the B & O debenture holders were thus effectively deprived of any opportunity to convert and participate in the dividend.

The first of these many lawsuits was filed soon after and, following a hearing, Judge Knox issued a preliminary injunction prohibiting distribution of MAC stock. *Pittsburgh Terminal Corp. v. B & O Railroad Co.,* 446 F.Supp. 656 (W.D.Pa.1978). Subsequently the B & O agreed to reserve sufficient shares of B & O and MAC stock to satisfy plaintiffs and any other similarly situated debentureholders in the event plaintiffs were successful in their suit. As a result, the Court of Appeals dissolved the injunction without published opinion. 578 F.2d 1375 (3d Cir.1978).

After extensive, hotly contested discovery and a non-jury trial, Judge Knox rejected each of plaintiffs' claims and entered judgment for the defendants. 509 F.Supp. 1002 (W.D.Pa.1981). The Court of Appeals reversed, its majority opinion resting on one narrow ground—that SEC Rule 10b–17 required the defendant railroads to give prior notice of the MAC dividend to debentureholders, affording them an opportunity to convert if so desired. 680 F.2d 933 (3d Cir.1982); *cert. den. sub nom., Price v. Pittsburgh Terminal Corp.,* 459 U.S. 1056, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982).

Unfortunately Judge Knox passed away during the pendency of the appeal, and Judge Weber picked up the standard his good friend had carried.[4] On remand, with directions from the Court of Appeals to fashion a remedy for the securities violation, Judge Weber issued an Opinion which was subsequently affirmed. 586 F.Supp. 1297 (W.D.Pa.1984); *aff'd sub nom. Guttmann v. B & O Railroad Co.,* 760 F.2d 257 and 760 F.2d 260 (3d Cir.1985); *cert. den.* 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed.2d 256 (1985).

The remedy fashioned by Judge Weber was designed to place plaintiffs in status quo ante—that is, plaintiffs were afforded the opportunity they would have had in December, 1977 if defendants had provided prior notice of the dividend. Plaintiffs

---

4. Judge Knox and Judge Weber were founding partners of an Erie, Pennsylvania law firm, and both served with distinction on the federal bench.

were given the opportunity to convert their debentures, share in the distribution of MAC stock, and also receive any other dividends on B & O and MAC stock declared after December 13, 1977. To balance the scale, plaintiffs choosing to convert and participate in the remedy were also required to disgorge any interest earned on the debentures after December 13, 1977.

Our present dispute has its origin in the fact that the original litigation was not conducted as a class action. There is considerable dispute among the present parties as to why class certification was denied in the principal prior actions,[5] but we need not address that matter. Despite the absence of a formal class under Fed.R.Civ.P. 23, defendant railroads nonetheless entered into an agreement with Chase, the Indenture Trustee, and filed a stipulation with the Court, agreeing to extend any remedy ultimately obtained by plaintiffs to non-party, similarly situated debenture holders. Since then, the meaning of "similarly situated debenture holders" has generated considerable controversy.

Fortunately for us, Judge Weber provided guidance on this matter in his remedy Opinion:

## V. SCOPE OF REMEDY

Defendants previously agreed to extend any remedy obtained in this suit to other similarly situated debenture holders. There was some discussion and apparent confusion on appeal as to the make-up of this "class". We endeavor to define it.

The remedy ordered here is limited to those persons who owned the subject debentures at the time of the violation, December 13, 1977, and who still own those debentures. Those persons who owned debentures on December 13, 1977, and subsequently converted to B & O common stock may also elect to participate in this remedy, obtaining MAC and its dividends, offset by interest accruing on the debentures after December 13, 1977. Those persons who acquired B & O debentures after December 13, 1977 are within the class of *Lowry* plaintiffs, and their claims will be resolved in that litigation. Those persons who owned B & O debentures on December 13, 1977 and subsequently sold their debentures are not within the scope of either this action or *Lowry*.

586 F.Supp. at 1305. The Court of Appeals subsequently affirmed this construction of the stipulation and scope of the remedy in an unpublished Opinion, noted *sub nom.* *Guttmann v. B & O Railroad Co.,* 760 F.2d 257 and 760 F.2d 260 (3d Cir.1985). (Higginbotham, J., dissenting).[6]

The present actions before the Court were filed on behalf of a class described in

---

**5.** Judge Knox stated at 509 F.Supp. 1002, 1005 that he had denied class certification because plaintiffs' facts were not typical of the class, plaintiffs' representation of the class would be inadequate, and the motion to certify a class was untimely, coming two years after suit was filed, in violation of Fed.R.Civ.P. 34(a).

On the other hand, the Court of Appeals is apparently under the impression that class action status was denied because of the Railroads' agreement to hold sufficient shares of B & O and MAC stock to satisfy any similarly situated debentureholders. *See* 680 F.2d at 939; 824 F.2d at 251.

From our review of the file, it appears to us that Judge Knox originally denied the motion for class certification for the reasons he described at 509 F.Supp. at 1005. In response to plaintiffs' motion for reconsideration, defendant railroads presented the agreement concerning treatment of similarly situated debentureholders, providing the trial court with an *additional* ground for denying class certification.

**6.** The claims of other groups of debenture holders have been resolved. The *Lowry* plaintiffs were found to be outside the scope of the stipulation in *Pittsburgh Terminal,* and their state and federal causes of action were found wanting. *Lowry,* 707 F.2d 721 (3d Cir.1983); *reh'g den.* 711 F.2d 1207 (3d Cir.1983); *on remand,* 629 F.Supp. 532 (W.D.Pa.1986).

Another group of claimants, not envisioned at the time of Judge Weber's remedy Opinion, were those who owned debentures on December 13, 1977, subsequently converted to B & O stock and later sold their stock before entry of judgment in *Pittsburgh Terminal.* Although Judge Weber believed those persons were not entitled to participate in the *Pittsburgh Terminal* remedy, The Court of Appeals disagreed. *Appeal of Harub,* 824 F.2d 249 (3d Cir.1987).

*See also, Ciarlante v. CSX Corp.,* 629 F.Supp. 534 (W.D.Pa.1986).

the last sentence of the above-excerpt: "Those persons who owned B & O debentures on Dec. 13, 1977 and subsequently sold their debentures ..." 586 F.Supp. at 1305. Because these persons were found to be outside the scope of the parties' stipulation in the underlying litigation, they were not entitled to participate in the remedy obtained there. However, they may have independent causes of action. Whether those claims are viable or timely are the questions before us today.

## ANALYSIS

The Complaints in the two above-captioned actions are essentially identical.[7] Both are styled as class actions with plaintiffs purporting to represent those persons who owned B & O debentures on December 13, 1977 and subsequently sold them prior to entry of judgment in *Pittsburgh Terminal*. As noted above, such persons were not eligible to participate in the *Pittsburgh Terminal* remedy.[8] The Complaints contain 5 Counts:

— § 10(b) securities violation, v. *all defendants*,

— RICO, 18 U.S.C. § 1962(c), v. *CSX* and *C & O*,

— RICO, 18 U.S.C. § 1962(a), v. *CSX, C & O*, and *B & O*,

— Breach of fiduciary duty of controlling shareholders, v. *CSX* and *C & O*,

— Breach of Fiduciary Duty of Indenture Trustee, v. *Chase*.

Jurisdiction over Counts 1 and 2 is premised on federal question jurisdiction and specific statutory grants. Plaintiffs have moved to delete Count 3 in light of the recent decision in *Rose v. Bartle*, 871 F.2d 331 (3d Cir.1989). Count 4 is grounded on

diversity. Count 5 is a state law claim based solely on pendent jurisdiction.

The events of December 13, 1977 are far removed in time, at least in terms of statute of limitations analysis. Consequently, plaintiffs' Complaints are not grounded solely on that ancient 10b–17 violation, but on subsequent events and the course of dealings between the railroads and Chase, the Indenture Trustee.

The focus of plaintiffs' claims are an alleged failure to disclose to debenture holders the material facts of the December 13, 1977 MAC stock dividend, the ensuing litigation and the agreements between the railroads and Chase extending the *Pittsburgh Terminal* remedy to all "similarly situated" debenture holders. Plaintiffs allege that defendants intentionally or recklessly withheld such information from the debenture holders, allowing many to sell their debentures and thereby unwittingly forfeit their right to participate in the *Pittsburgh Terminal* remedy.

Both Chase and the Railroads have filed motions to dismiss, contending that plaintiffs have failed to state a cause of action on any Count, and that all claims are beyond the applicable limitations period. The parties have filed an extensive series of briefs, and we now wade through these to address the motions to dismiss.

### I. Chase Manhattan Bank

#### A.) Fiduciary Duty

In Count 5, plaintiffs allege that defendant Chase breached a fiduciary duty owed to debenture holders under the Indenture by failing to disclose to them material facts concerning the MAC dividend and subsequent events, and by failing to treat debenture holders equally. The parties agree that this pendent state claim is governed by New York law.

---

**7.** *Savin v. CSX*, CA 87–971, was originally filed in the U.S. District Court for the Southern District of New York, but was transferred here pursuant to 28 U.S.C. § 1404(a).

**8.** Plaintiffs in *Lorenz v. CSX*, CA 87–866 also propose to represent a class of debenture holders on December 13, 1977 who subsequently converted the debentures to B & O common stock and then sold the stock prior to judgment

in *Pittsburgh Terminal*. When this suit was filed, Judge Weber had held that such persons were outside the scope of the *Pittsburgh Terminal* remedy, but the Court of Appeals later reversed, permitting so-called "stock sellers" to participate in the remedy. 824 F.2d 249 (3d Cir.1987). Such persons having been afforded relief, this aspect of plaintiffs' Complaints is now superfluous.

■ Central to our analysis is an understanding of the nature and function of an Indenture Trustee. Unlike the typical trustee whose rights and duties are grounded in the common law, the obligations of the Indenture Trustee are circumscribed by the terms of the Indenture. His duties are defined by contract, and he owes the debenture holders no fiduciary duties beyond those provided by the Indenture. *Hazzard v. The Chase National Bank*, 159 Misc. 57, 287 N.Y.S. 541 (Sup.Ct. 1936), *aff'd* 257 App.Div. 950, 14 N.Y.S.2d 147 (1st Dept.1939), *aff'd* 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708, 61 S.Ct. 319, 85 L.Ed. 460 (1940); *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985); *Elliott Associates v. J. Henry Schroder Bank and Trust Co.*, 838 F.2d 66 (2d Cir.1988); *Broad v. Rockwell International Corp.*, 642 F.2d 929, 957–958 (5th Cir.1981) (applying New York law).

■ Furthermore, the Indenture at issue in the present case specifically provides, at Article 10, Section 1(c):

... and no implied covenants shall be read into this Indenture against the Trustee, but the duties of the Trustee to the Company and to all others shall be idetermined solely the provisions of this Indenture.

Although plaintiffs argue that such a disclaimer is ineffective because not included on the face of the debentures, we note that the debentures of course specifically incorporate the Indenture and direct debenture holders to the Indenture for an understanding of the rights and duties of the Indenture Trustee. Also, although it does not apply to this Indenture because it was issued by a railroad, the Trust Indenture Act of 1939, 15 U.S.C. § 77*ooo* (a)(1) specifically approves of the inclusion of such provisions in indentures.

Plaintiffs strongly urge that an implied duty of good faith and fair dealing applies to all contracts under New York law, including indentures, and therefore if the subject Indenture does not have a notice requirement, one should be implied. In support, plaintiffs cite *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.), *cert. denied* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975).

In *Van Gemert*, the Indenture required the Trustee to provide notice of an upcoming redemption call by simply publishing the information in a newspaper on two occasions. The debentures and prospectus failed to advise debentureholders that such critical notice on a very basic feature would not be made by mail or some other more common and more adequate means. The *Van Gemert* court concluded that, although the Trustee technically complied with the requirements of the Indenture, it failed to satisfy the implied duty of good faith and fair dealing. Thus, where the Indenture imposed a duty to provide notice, the implied duty of good faith and fair dealing that applies to all New York contracts would require a reasonably prudent effort to perform the contractual duty.

■ But while this doctrine of New York contract law may require good faith and fair dealing in the performance of a duty created by the Indenture, it will not create a duty where one does not exist. The doctrine does not provide courts with carte blanche to rewrite contracts. It ensures the proper performance of the bargained-for provisions of the contract, but it will not impose new obligations outside the agreement. *E.g., Hartford Fire Insurance Co. v. Federated Department Stores, Inc.*, 723 F.Supp. 976 (S.D.N.Y.1989); *Gardner & Florence Call Cowles Foundation v. Empire, Inc.*, 589 F.Supp. 669, 673 (S.D.N.Y.1984), *vac'd on procedural grounds*, 754 F.2d 478 (2d Cir.1985).

■ We turn then to an examination of the Indenture, in search of a source of the Trustee's duty to disclose. A trip through this mind-numbing 71 pages of legalese leaves us with the conclusion that, although the Indenture requires notice in a variety of situations, there is no notice or disclosure provision even remotely applicable here. Indeed plaintiffs have been unable to identify an explicit provision applicable to the present circumstances, such as a requirement that the Trustee annually disclose any actions taken in regard to the Indenture. *See* American Bar Foundation,

*Commentaries on Indentures*, Model Debenture Indenture § 7–3 at p. 285 (1971).

Rather, plaintiffs seek to manufacture an implied notice requirement from the interstices of the Indenture. Plaintiffs argue that the Trustee's agreements with the Railroads to permit all debenture holders similarly situated to the plaintiffs in *Pittsburgh Terminal* to participate in any potential remedy materially affected their conversion rights, and therefore Chase was obligated to notify debenture holders of those agreements. *See*, Indenture, Art. 14, Sec. 6.

First of all, plaintiffs incorrectly characterize the remedy agreements as affecting their rights under the Indenture. To the contrary, the rights and duties of the debenture holders under the Indenture remained unchanged. Plaintiffs had the same rights with respect to conversion, redemption, payments of interest and premiums, and all other matters under the Indenture as always, no more, no less.

What the agreements with B & O had done was to provide to eligible debenture holders the opportunity to participate in a potential future remedy *outside* the Indenture, in a proceeding outside the Indenture. These proceedings had not been instigated by the Trustee and no debenture holder ever asked the Trustee to institute action.

Furthermore, the Trustee's actions did not bind or limit any debenture holder to the potential remedy described in the agreements. Debenture holders were free to institute action as Pittsburgh Terminal Corp. did, to assert securities law violations or breach of the Indenture, to seek money damages or the opportunity to participate retroactively in the MAC stock dividend. Debenture holders were free to petition the Trustee as provided in the Indenture, to institute action against the Railroads. Not having circumscribed the debenture holders' rights, the Trustee was under no discernible obligation under the Indenture to provide notice to debenture holders of a potential remedy in an uncertain claim filed independent of the Trustee.

In this respect, it is also important to note that the plaintiffs in *Pittsburgh Ter-minal* failed to establish any violation of the Indenture by the Railroads in the December 13, 1977 MAC transaction. Indeed Judge Knox specifically rejected this claim and the Court of Appeals did not reach it. *See*, 680 F.2d at 946 (Judge Adams' dissent). This reaffirms the Trustee's position that the agreements with the Railroads did not alter or affect the terms of the Indenture.

 It is also clear that the Trustee is under no obligation to secure for debenture holders any greater right or interest than that provided by the Indenture. *Elliott Associates v. J. Henry Schroder Bank and Trust Co.*, 838 F.2d 66 (2d Cir.1988). Chase was under no compulsion to effect a remedy for alleged securities law violations and it likewise was under no compulsion to publicize the existence of such possibilities.

This brings us to plaintiffs' argument that in entering the agreements with the Railroads, Chase failed to treat all debenture holders on an equal and ratable basis as required by the Indenture because it allowed debenture holders to sell their debentures and unwittingly forfeit any chance to participate in the potential remedy preserved in *Pittsburgh Terminal*. To the contrary, the agreements treated all debenture holders in the same manner as the plaintiffs in *Pittsburgh Terminal*—when Pittsburgh Terminal plaintiffs sold debentures prior to judgment, they were not permitted to share in the remedy. The plaintiffs in the present cases were treated no better, no worse, which is what the Indenture requires. Furthermore, there is no allegation that the Trustee provided notice to some debenture holders, but not to others, which is the type of conduct which may be actionable under this provision. Rather, all debenture holders were subjected to the same risk, a risk born of the absence of notice requirements in the Indenture.

For the reasons stated, we conclude that plaintiffs fail to state a claim against Chase for violation of a fiduciary duty as Indenture Trustee. Count 5 will therefore be dismissed.

### B.) § 10(b) Claim

The question presented by Count 1 concerning Chase is whether § 10(b) of the Securities Exchange Act imposes any obligations on the Indenture Trustee above and beyond those contained in the Indenture.

■ Imposition of such a duty would appear to be inconsistent with the nature and purpose of an Indenture, and the carefully defined role of the Indenture Trustee, as discussed in the preceding section of this Opinion. Indeed one court has recently concluded that:

"... where the duties of an issuer (and a Trustee) to debenture holders are circumscribed by the Indenture Agreement, no extraordinary duties will be implied under the federal securities laws."

*Metropolitan Securities v. Occidental Petroleum Corp.*, 705 F.Supp. 134, 141 (S.D. N.Y.1989), citing *Meckel v. Continental Resources Co.*, 758 F.2d 811 (2d Cir.1985).

We have not uncovered any contrary authority, imposing on an Indenture Trustee greater duties under § 10(b) than are required by the Indenture, and plaintiffs' citations are entirely inapposite. There is likewise no authority for the premise that an Indenture Trustee who complies with the requirements of the Indenture can still be liable for his silence as an aider and abetter to another's violation. Absent direction to the contrary, we continue to adhere to the longstanding premise that the obligations of the Indenture Trustee are described by the Indenture alone. We therefore conclude that plaintiffs cannot state a claim against Chase for violation of § 10(b), and Count 1 will be dismissed as to Chase.

### II. Railroads

The Railroads' basic argument is reminiscent of that put forth by the Indenture Trustee. Defendant railroads contend that they owe no duty to convertible debenture holders other than those prescribed in the Indenture. Because the Indenture at issue imposes no duty to speak in the circumstances described in plaintiffs' Complaint, defendants argue that there can be no breach of duty and all claims against them must be dismissed.

The one problem with this argument is that it has been rejected by an appellate panel at an early stage of this litigation. In *Pittsburgh Terminal,* a majority of the panel concluded that, Indenture notwithstanding, Rule 10b–17 imposed an independent duty on the Railroads to provide notice to debenture holders of a dividend declaration material to their conversion rights. 680 F.2d 933 (1983).

But the appellate Opinion rested on that one narrow ground—the effect of Rule 10b–17. In announcing the judgment of the Court, Judge Gibbons identified several other sources of a duty to speak, including the New York Stock Exchange Listing Agreement, New York contract law, and Maryland and New York fiduciary law. Judge Adams on the other hand dissented, disagreeing with Judge Gibbons on all these sources. Judge Garth joined Judge Gibbons to form a majority, but only on the Rule 10b–17 violation. He declined to reach any of the other alleged sources of a duty to speak, leaving those questions open for future consideration. We now examine plaintiffs' claims against the Railroad defendants.

### A.) Fiduciary Duty

In Count 14, plaintiffs charge defendants C & O and CSX with a common law fiduciary duty as majority, controlling shareholders in the B & O. Plaintiffs allege that by failing to make the various material disclosures described in plaintiffs' Complaint, these defendants breached that fiduciary duty.

■ Defendants argue that they do not owe debenture holders the same fiduciary obligations they would owe to minority shareholders. Rather, they contend that their fiduciary responsibilities are entirely circumscribed by the terms of the Indenture.

As discussed above with respect to the liability of the Indenture Trustee, the Indenture is designed and intended to be an all-encompassing document. It carefully and deliberately sets forth at length the

relative rights and duties of the issuer, holder and trustee.

It is this exhaustively complete contractual nature of the relationship that differentiates the debenture holder from the shareholders, and militates against imposing an additional set of unbargained for obligations:

> This case does not involve the measurement of corporate or directorial conduct against that high standard of fidelity required of fiduciaries when they act with respect to the interests of the beneficiaries of their trust. Under our law—and the law generally,—the relationship between a corporation and the holders of its debt securities, *even convertible debt securities,* is contractual in nature ... The terms of the contractual relationship agreed to and not broad concepts such as fairness define the corporation's obligation to its bondholders (emphasis added) (citations omitted).

*Katz v. Oak Industries, Inc.,* 508 A.2d 873 (Del.Ch.1986); *see also, Norte & Co. v. Manor Healthcare Corp.,* slip op. Del.Ch., Nos. 6827, 6831 (Nov. 21, 1985); *Simons v. Cogan,* 549 A.2d 300 (Del.Sup.Ct.1988); *Metropolitan Securities v. Occidental Petroleum Corp.,* 705 F.Supp. 134, 141 (S.D. N.Y.1989); American Bar Foundation, *Commentaries on Indentures* (1971).

■ In the alternative, if there is an independent fiduciary duty owed to debenture holders, it is satisfied if the defendants comply with the terms of the Indenture. *Broad v. Rockwell International Corp.,* 642 F.2d 929, 958–959 (5th Cir.1981). Applying New York law, that Court held that there can be no breach of fiduciary duty without a predicate breach of the Indenture. Plaintiffs have not charged defendant railroads with breach of the Indenture and have not identified any source of notice duty in the contract.

■ Finally, to the extent plaintiffs seek to ground their claim on an implied duty of good faith and fair dealing under New York contract law, we adopt our discussion of the same issue with respect to the Indenture Trustee.

For the reasons stated we conclude that defendants owe no fiduciary duty to debenture holders or, in the alternative, that plaintiffs fail to allege or identify any underlying breach of the Indenture. Count IV will therefore be dismissed.

### B.) RICO

Plaintiffs asserted two RICO claims: Count II alleged a violation of § 1962(c), and Count III asserted a violation of § 1962(a). Plaintiffs have since withdrawn Count III in light of *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989).

Defendant Railroads have interposed a variety of challenges to Count II, including deficiencies in the pleading of pattern and enterprise. Plaintiffs subsequently moved to amend the Complaint to add an additional 20 pages of factual averment, primarily to supplement the averments of a pattern.

■ We first address the motion to amend. The proposed amendment recites a number of events in B & O's history from 1961 to 1987. While the following list is not exhaustive, the principle events described are:

— B & O's no-dividend policy from 1961 to 1978.

— B & O's purchase of convertible debentures at less than face value in 1974–77.

— The December 13, 1977 dividend and the creation of MAC.

— The agreement to extend any remedy in *Pittsburgh Terminal* to similarly situated non-party debentureholders, and subsequent interpretations of that agreement.

— The sale of the assets of the Western Maryland in 1978.

— C & O's imposition of excessive costs on the B & O in 1986.

— The merger of the B & O into the C & O in 1986–87, eliminating B & O's minority shareholders.

First of all, we note that this proposed amendment comes more than two years after this suit was filed. None of the information is new. All the facts were available to plaintiffs in 1987 when suit was filed,

and indeed some of the events described are nearly 30 years old! Almost all of the events recited occurred more than five years prior to the Motion to Amend. Although discovery has not yet begun in this case because of the long delay over a complex, multi-faceted motion to dismiss, the proposed amendment is nonetheless considerably dilatory. Plaintiffs' counsel has previously amended these Complaints on several occasions and first mentioned in the RICO Case Statement, filed two years earlier, the possibility of amending to include these facts. Plaintiffs have had repeated opportunities to amend in a timely fashion, and the pleadings must close at some point.

We also note that nothing in *H.J. Inc. v. Northwestern Bell Telephone Co.*, — U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), can serve as an excuse for this amendment. There is nothing new in that decision which would make this information relevant for the first time.

Although plaintiffs argue that the amendment would not add any new claims, it would dramatically alter the nature of this litigation. Plaintiffs have challenged every significant event in the last 30 years of B & O's history, finding demons in every shadow.

Finally, we strongly doubt the relevance of any of this litany to the alleged fraud at issue in plaintiffs' original Complaint. None of this has even tangential relevance to the allegedly fraudulent effort to leave debentureholders in the dark about their opportunity to participate in the *Pittsburgh Terminal* remedy. For example, many of the events alleged in the amendment occurred long after plaintiffs had sold their debentures. As evidence of a pattern of racketeering activity, these events have little connection other than the fact that they all involved the B & O.

For the reasons stated, the motion to amend the Complaint will be denied.

■ We return then to an analysis of Count II. Section 1962(c) provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To plead a claim under this provision, plaintiff must allege: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (4) that defendant participated through a pattern of racketeering activity that must include the allegation of at least two predicate racketeering acts. *Sedima, S.P.R.L. v. Imprex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

Defendants contend that plaintiffs' Complaint is flawed because it fails to allege a RICO person separate and distinct from the RICO enterprise. *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628, 634 (3d Cir.1984). However, the Complaint clearly identifies the B & O as the enterprise for purposes of Count II, whereas only C & O and CSX are named as defendants.

In a RICO Case Statement filed at the behest of Judge Weber, plaintiffs listed the predicate acts upon which they relied:

(i) December 13, 1977 The securities violation as found by the Court in *PTC*.

(ii) May 2, 1980 The mailed stipulation, that in the absence of additional facts, was false and misleading and led the *PTC* plaintiffs to conclude that debentureholders as of December 13, 1977 were within the scope of the defendants' 1978–1979 letter agreements when they were not.

(iii) August 19, 1982 The false and fraudulent representation, by mail, to the Dourt in *Lowry* and the Parties in *Lowry* and *PTC* that debentureholders as of December 13, 1977 were within the scope of the defendants' 1978–1979 letter agreements when they were not.

(iv) June 29, 1983 The false and fraudulent representation in defendants' response filed in *PTC* (by mail) that de-

bentureholders as of December 13, 1977 were within the scope of the defendants' 1978–1979 letter agreements when they were not.

There is no doubt that one predicate act exists—the Court of Appeals found the December 13, 1977 MAC dividend to be a deceptive and manipulative device in violation of the securities laws. *Pittsburgh Terminal*, 680 F.2d 933. More difficult is assessing the other alleged predicate acts.

 If we assume that these averments do sufficiently state fraud, we must consider whether plaintiffs suffered injury as a result. To assert a claim under RICO, plaintiff must have suffered injury as a result of the predicate acts. 18 U.S.C. § 1964(c); *Sedima*, 473 U.S. at 496–497, 105 S.Ct. at 3285; *Shearin v. E.F. Hutton*, 885 F.2d 1162 (3d Cir.1989). Although plaintiffs allege that defendants' descriptions of the scope of its remedy agreement in the course of the underlying litigation were misleading or untrue, plaintiffs also admit that they were never aware of these statements. Even if we assume *arguendo*, that the alleged statements were intentionally false and designed to mislead, they could not mislead those persons who did not receive the statements. Plaintiffs do not allege that they relied on defendants' false promise of protection, because they simply never heard the promise. In short, plaintiffs are unable to establish any injury as a result of any alleged predicate act other than the initial 1977 securities fraud.

For the reasons stated, Counts II and III will be dismissed. Consequently we need not address the issue of "pattern" or whether the applicable limitations period bars this claim.

### C.) § 10(b) violations

We now return to Count I, which alleges securities violations by all of the railroad defendants. Chase was also charged in this Count, but for the reasons discussed above, the claim against Chase will be dismissed.

In reviewing the Complaints and the extensive materials submitted on the motion, we note that plaintiffs have been imprecise in defining the source of defendants' alleged duty to discuss material facts to debentureholders, and this imprecision raises some skepticism for the ultimate viability of plaintiffs' claims. Nonetheless, we cannot say on a motion to dismiss that plaintiff is unable to state any potential claim for recovery. Perhaps the development of facts and the narrowing of issues in the course of discovery will bring greater focus to the case, and then the viability of plaintiffs' securities law claim may be tested by a well-supported motion for summary judgment, if warranted. In any event, the matter is not susceptible of disposition at this time.

Defendants have also argued that the applicable limitations periods bar plaintiffs' claim in Count I. However, the underlying claim is one of failure to disclose, thus presenting difficulties in assessing the accrual date of a cause of action, and in determining whether tolling should apply. These are matters peculiarly grounded in fact and, we believe, premature on a motion to dismiss in these circumstances. Again, such arguments may be better addressed on a motion for summary judgment at a later date, but we make no decision at this time.

For the reasons stated, plaintiffs' motion to dismiss Count I will be denied, without prejudice to renewal of the arguments in a well-supported motion for summary judgment, if warranted.

### CONCLUSION

For the reasons stated above, plaintiffs' Motions to Amend the Complaints will be denied; all claims against defendant Chase will be dismissed, and Counts II—IV against defendant Railroads will be dismissed. The motion of defendant Railroads to dismiss Count I will be denied without prejudice to renewal of the arguments at a later date on a well-supported motion for summary judgment.